## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **LISA STEVENS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 2:20-cv-00325-JHR** |
| | ) | |
| **SOUTHERN MAINE ORAL AND** | ) | |
| **MAXILLOFACIAL SURGERY, P.A.,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM DECISION ON DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT[1]

Defendant Southern Maine Oral and Maxillofacial Surgery, P.A., (SMOMS) moves for summary judgment on all counts of plaintiff and former employee Lisa Stevens' Second Amended Complaint, *see* Defendant's Motion for Summary Judgment ("Motion") (ECF No. 41) at 25; Second Amended Complaint and Request for Jury Trial with Injunctive Relief Sought ("Second Amended Complaint") (ECF No. 37), arguing that she raises no triable issues that SMOMS failed to reasonably accommodate her disability, subjected her to a hostile work environment, or retaliated against her for taking protected medical leave and/or reporting conduct that she reasonably believed was unlawful, *see id*. at 2-25.  With the benefit of oral argument, and for the reasons that follow, the motion is denied.

### I.  Applicable Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence

---

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment.  ECF No. 28.

about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAm. Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## II.  Factual Background

The evidence viewed in the light most favorable to Stevens reveals the following.[2]

Stevens worked as a dental assistant at SMOMS, a professional corporation that provides oral surgery services at offices in Windham, Portland, and Biddeford, from 2012 to 2019. Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment

---

[2] Stevens refers to "dental assistants" and "clinical assistants" interchangeably, while SMOMS refers to "dental assistants." For ease of reference, I use the term "dental assistants."

("Defendant's SMF") (ECF No. 42) ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Opposing SMF"), commencing on page 1 of Plaintiff's Opposing Statement of Material Facts and Additional Statement of Material Facts ("Plaintiff's SMFs") (ECF No. 47), ¶ 1; Plaintiff's Additional Statements of Material Fact ("Plaintiff's Additional SMF"), commencing on page 34 of Plaintiff's SMFs, ¶ 1; Defendant's Reply Statement of Facts in Support of Its Motion for Summary Judgment ("Defendant's Reply SMF") (ECF No. 58) ¶ 1.  Three general surgeons own the corporation: Dr. Jeffrey Doss, Dr. Richard Crawford, and Dr. Timothy Mitchell. Defendant's SMF ¶ 2; Plaintiff's Opposing SMF ¶ 2.  SMOMS also employs a fourth "Associate" physician, Dr. Daniel Traub, who is not an owner.  *Id.* ¶ 3.  Kathi Lucas is SMOMS' business manager.  *Id.* ¶ 4.  In 2018 and 2019, Lucas had overall responsibility for the corporation's human resource functions.  *Id.* ¶ 5.

SMOMS employs several dental assistants, each of whom is assigned to work primarily at a particular office.  *Id.* ¶ 11.  Starting in 2017 or 2018, Stevens worked primarily in SMOMS' Portland office.  *Id.* ¶ 13.  In 2018 and 2019, Pepper Pendleton was the "lead" assistant in the Portland office and in that capacity was Stevens' direct supervisor.  *Id.* ¶ 14.  Although Pendleton reported to Lucas, Lucas was almost never in the Portland office.  Plaintiff's Additional SMF ¶ 5; Defendant's Reply SMF ¶ 5; Plaintiff's Additional SMF ¶ 6; Declaration of Lisa Stevens ("Stevens Decl."), Exh. A (ECF No. 47-1) to Plaintiff's SMFs, ¶ 6.

Stevens considered Pendleton to be her supervisor with authority to discipline her, Plaintiff's Additional SMF ¶ 2; Stevens Decl. ¶ 4,[3] and Pendleton had authority to discipline employees in the SMOMS Portland office, Plaintiff's Additional SMF ¶ 3; Deposition of Kathleen (Kathi) Lucas ("Lucas Dep."), Exh. E (ECF No. 40-5) to Stipulated Record (ECF No. 40), Page

---

[3] I deny SMOMS' request to strike this statement on the basis that Stevens' subjective belief is irrelevant to whether Pendleton possessed such authority, Defendant's Reply SMF ¶ 2, a proposition for which SMOMS cites no authority.

ID # 401 at 37.[4]  Pendleton could also contribute to decisions with regard to hiring, firing, and discipline of SMOMS staff.  Plaintiffs' Additional SMF ¶ 4; Defendant's Reply SMF ¶ 4.

The four SMOMS surgeons operate in different offices depending on the day.  Defendant's SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8.  The surgeons perform a wide variety of surgical procedures, some using intravenous (IV) general anesthesia, and some using local anesthesia.  *Id.* ¶¶ 15-16.  An uncomplicated extraction may require as little as five minutes of surgeon time, while other procedures may require 60 minutes or more of surgeon time.  *Id.* ¶¶ 18-19.[5]  SMOMS surgeons would not be able to complete surgical procedures without dental assistants.  Plaintiff's Additional SMF ¶ 19; Defendant's Reply SMF ¶ 19.

The pre- and post-operative clinical activities that dental assistants most commonly perform typically take about 30 minutes: five to 20 minutes pre-procedure and 10 to 15 minutes post-procedure.  Plaintiff's Additional SMF ¶ 13; Stevens Decl. ¶ 13.  The doctors typically come into the operatory when the patient is ready, leave when the operation is complete, and do not observe the pre- and post-operative tasks.  Plaintiff's Additional SMF ¶ 11; Defendant's Reply SMF ¶ 11.  As a dental assistant, Stevens performed a variety of tasks, including pre-operative and post-operative work, draping and undraping patients, performing x-rays, taking patients to recovery, removing and cleaning the dishes and instruments, and prepping the room for the next procedure.  *Id.* ¶ 9.  She was constantly moving around on her feet.  Plaintiff's Additional SMF ¶ 10; Stevens Decl. ¶ 10.

---

[4] I deny SMOMS' request to strike this statement the basis that the citation given does not support it.  Defendant's Reply SMF ¶ 3.  While Lucas did not mention Pendleton, she testified, when asked if "anyone in your absence [is] authorized to act on your behalf and discipline[,]" "[t]here is . . . a lead clinical assistant at each office."  Lucas Dep., Page ID # 401 at 37.
[5] My recitation incorporates Stevens' qualification.  Plaintiff's Opposing SMF ¶ 19; Stevens Decl. ¶ 12.

If a dental assistant needs to take a break during the procedure, another dental assistant is not necessarily available to take that person's place, and not everyone is qualified to assist with certain procedures.  Plaintiff's Additional SMF ¶ 15; Stevens Decl. ¶ 21.  The SMOMS Portland office was typically very fast-paced and had few extra staff, as a result of which the office often would be short-staffed if a staff person called out for the day.  Plaintiffs' Additional SMF ¶ 8; Stevens Decl. ¶ 8.

In early December 2018 Stevens notified Lucas of her plan to have surgery at the end of that month.  Defendant's SMF ¶ 44; Plaintiff's Opposing SMF ¶ 44.  Stevens has testified that on December 20, 2018, Pendleton yelled at her after they had an accidental physical collision in the workplace.  *Id*. ¶ 42.  Stevens believes that Pendleton yelled at her because she was angry that Stevens was preparing to take medical leave, although Pendleton never told her that was the reason.  *Id*. ¶ 43.  On December 20, 2018, Stevens emailed Lucas asking to be transferred from the Portland to the Windham office after her leave because of challenges she was experiencing in getting along with Pendleton, writing, "Pepper seems to have an attitude towards me and I feel she is incompetent and I don't feel any support from her when I am here."  *Id*. ¶ 40.  Stevens did not tell Lucas that she thought Pendleton was treating her poorly because of her plan to go out on medical leave.  *Id*. ¶ 41.

Stevens underwent foot surgery on December 26, 2018.  *Id*. ¶ 45.  She originally planned to return to work in March 2019.  *Id*. ¶ 46.  On March 21, 2019, Stevens called Lucas to let her know that her doctor had told her that she was not fully healed and that she would need more time off.  *Id*. ¶ 47.  The way that Lucas reacted made Stevens fear for her job.  Plaintiff's Additional

SMF ¶ 20; Stevens Decl. ¶ 26.[6]  Lucas stated, "I can't believe you're going to be out a whole other month!" and "Why aren't you able to come back?," making Stevens feel that Lucas was threatening her job and was extremely mad that Stevens needed more time out after she had already been on medical leave.  Plaintiff's Additional SMF ¶ 21; Stevens Decl. ¶ 27.  The phone call with Lucas left Stevens in tears.  Plaintiff's Additional SMF ¶ 22; Stevens Decl. ¶ 28.

On April 15, 2019, Lucas sent Stevens an email telling her that she (Lucas) would be starting a vacation on Friday, April 19, and that she wanted to confirm Stevens' schedule by the afternoon of Thursday, April 18.  Defendant's SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50.  In the same email chain, Stevens said:

> I am hoping to be able to work at least 32 hours to get my bennies going again and start paying smoms back.  I am so eager to get back you have no idea!  I still can only walk 2 miles at the most a day and can't stand for more than 30 minutes but I can do paperwork and nurse calls!  I am available to work in the windham office as well!

*Id*. ¶ 51.

On April 18, 2019, Stevens and Lucas met to discuss Stevens' schedule.  *Id*. ¶ 52.  Stevens presented Lucas with a doctor's note that authorized her return to work at 32 hours per week "with no prolonged standing or walking."  *Id*. ¶ 57.  Lucas informed Stevens that, in order to return to work, she needed to get a note that clarified her standing restrictions.  *Id*. ¶ 59.  Stevens called her doctor from Lucas' office to explain that her employer required a note that clarified how long she could stand and how long she would need to sit while at work.  *Id*. ¶ 61.  The doctor's office then sent an amended letter specifying that Stevens needed a "15 minute break every 60 minutes while

---

[6] I deny SMOMS' requests to strike paragraphs 20, 21, and 22 of the Plaintiff's Additional SMF on the basis that Stevens' subjective reactions to Lucas' tone of voice are irrelevant, Defendant's Reply SMF ¶¶ 20-22, in support of which it cites no authority.

standing" with "no prolonged standing or walking . . . [d]esk or light duty . . . 32 hours a week[.]"
*Id*. ¶ 62.[7]

The same day (April 18, 2019) Lucas emailed Stevens confirming the new restrictions imposed by her physician and proposing a schedule for her return to the workplace: four 6.5-hour days and one six-hour day, totaling 32 hours per week. *Id*. ¶ 64. Stevens responded, asking to be allowed to work through lunch and leave 30 minutes earlier each day. *Id*. ¶ 65. Lucas agreed. *Id*. ¶ 66.

Lucas left for vacation on April 19, 2019. *Id*. ¶ 67. Stevens worked a total of 17 days between April 19, 2019, when she was allowed to return to work, and May 13, 2019, when she was fired. Plaintiff's Additional SMF ¶ 33; Defendant's Reply SMF ¶ 33. When Stevens returned to work, she assumed that Lucas had informed Pendleton and all of the doctors about her restrictions, although she does not know for sure if Lucas did inform all of the doctors. *Id*. ¶ 29.

On April 24, 2019, in anticipation of Stevens' assignment to work with Dr. Mitchell on April 26, Pendleton sent an email to Dr. Mitchell, with copies to Lucas and Stevens, stating:

> Welcome back, Lisa. I was looking at the schedule for Friday, April 26. We have enough people now that Lisa is back for this day. However, she can only be on her feet for about an hour and then needs to sit for about 15 mins. I asked Lisa if she would be okay with going into surgery with you, Dr. Mitchell or doing recovery? She stated that she would prefer to be in surgery with you because in recovery she would be standing a lot more and walking around a lot more. I told her that I would let you know. I advised her to let me know if she needed or wanted to switch with me throughout the morning.
>
> The gals on your team will need to work together and you may have a lag in a passer if Lisa needs to sit. But I will try and do my best to come in and help as much as I can. Let me know if you want me to change anything or make it easier or better.

Defendant's SMF ¶ 69; Plaintiff's Opposing SMF ¶ 69.

---

[7] My recitation incorporates Stevens' qualification. Plaintiff's Opposing SMF ¶ 62; Attach. 1 to Lucas Dep., Page ID # 506.

Stevens testified that on one occasion during the week of April 22, 2019, she was required to stand on her feet for more than 45 minutes while assisting with a multiple-implant procedure performed by Dr. Crawford. *Id.* ¶ 72. Stevens testified that during this procedure she complained to Pendleton, who urged her to "hold on until the end of the case." *Id.* ¶ 74.

After Pendleton refused Stevens' request for a break during her first week back at work, Stevens felt pressured to stand during procedures when she was physically unable to stand and should have taken a break. Plaintiff's Additional SMF ¶ 39; Stevens Decl. ¶ 39.[8] Stevens would come home from work in agony and pain because of having been on her foot all day without being able to take a break. Plaintiff's Additional SMF ¶ 40; Stevens Decl. ¶ 40. Pendleton would also frequently ask Stevens to work longer hours than Stevens' restrictions allowed, and Stevens would tell her that she could not work longer per her doctor's orders. Plaintiff's Additional SMF ¶ 41; Stevens Decl. ¶ 41. In response, Pendleton would roll her eyes in an exasperated way and say something like, "How much longer are we going to have to do this?" *Id.*

Stevens believes that during the week of April 29, 2019, there were some days when she stood for more than 45 minutes without a break. Defendant's SMF ¶ 77; Plaintiff's Opposing SMF ¶ 77. She has testified that on five occasions, while working in the recovery area, she had to be on her feet for more than 45 minutes without a break. *Id.* ¶ 78.

After Stevens returned from medical leave, Dr. Mitchell would walk around the office near her using an exaggerated limp and make faces at her. Plaintiff's Additional SMF ¶ 35; Stevens Decl. ¶ 36. When she told him to stop, he just snickered. *Id.* Even though Dr. Mitchell mocked

---

[8] I deny SMOMS' request to strike this statement on the basis that what Stevens felt to be true, unsupported by evidence, is irrelevant. Defendant's Reply SMF ¶ 39. The case that SMOMS cites in support of that request, *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018), stands not for the proposition that such a statement is irrelevant but, rather, that "[a] court need not take at face value a party's subjective beliefs, even if offered in the form of testimony, if those subjective beliefs are conclusory, self-serving, and lack factual support in the record." *Id.* (citation and internal quotation marks omitted).

Stevens like this on more than one occasion, she did not report his behavior to Lucas because doctors could do whatever they wanted and suffer no repercussions. Plaintiff's Additional SMF ¶ 36; Stevens Decl. ¶ 37.[9]

On at least two occasions prior to April 30, 2019, Stevens overheard her co-worker, Heather Melcher, saying that Stevens "should be healed by now" and should not need special accommodations. Defendant's SMF ¶¶ 87, 89; Plaintiff's Opposing SMF ¶¶ 87, 89. On another occasion, Melcher commented that Stevens should not need special treatment and should be healed by now, while Pendleton, Melcher, and Stevens were all close together (within three feet) at the nurse's station, and Pendleton made a little snicker. *Id*. ¶ 90; Plaintiff's Additional SMF ¶ 45; Stevens Decl. ¶ 45.

Pendleton's behavior, such as rolling her eyes and acting exasperated whenever Stevens could not work longer than her restrictions would allow, left Stevens feeling that SMOMS did not take her disability seriously and made her feel terrible about needing to have accommodations. Plaintiff's Additional SMF ¶ 43; Stevens Decl. ¶ 43.[10] Pendleton's behavior, coupled with Melcher's multiple comments that "you shouldn't need special accommodations" or "you should be healed by now[,]" made Stevens feel like everyone thought she was faking her disability and that she was lazy and worthless. Plaintiff's Additional SMF ¶ 44; Stevens Decl. ¶ 44.

---

[9] I deny SMOMS' request to strike this statement on the bases that it is conclusory and does not show that Stevens is competent to testify on the matter. Defendant's Reply SMF ¶ 36. Stevens is competent to testify why, based on her seven years' experience at SMOMS, she did not report this behavior to Lucas.

[10] I deny SMOMS' requests to strike paragraphs 43, 44, and 46 on the basis that Stevens' perception of the sentiments of her co-workers, unsupported by evidence supporting that perception, is irrelevant. Defendant's Reply SMF ¶¶ 43, 44, 46. SMOMS again cites *Irobe*, which stands not for the proposition that such statements are irrelevant but, rather, that "[a] court need not take at face value a party's subjective beliefs, even if offered in the form of testimony, if those subjective beliefs are conclusory, self-serving, and lack factual support in the record." *Irobe*, 890 F.3d at 381 (citation and internal quotation marks omitted).

The behavior of Pendleton and Melcher made Stevens feel worthless and that no one in the office supported her.  Plaintiff's Additional SMF ¶ 46; Stevens Decl. ¶ 46.  She would come home in tears.  *Id.*  Stevens believed that Pendleton and Melcher were being mean to her and singling her out because she needed accommodations even after she had been out on leave, as though she had been a good worker previously but was bad following her return from leave.  Plaintiff's Additional SMF ¶ 47; Stevens Decl. ¶ 47.

Stevens had a good relationship with Dr. Traub and reported to him on several occasions what she was going through in the office, including Dr. Mitchell's mockery and Melcher's comments.  Plaintiff's Additional SMF ¶ 48; Stevens Decl. ¶ 48.  Dr. Traub testified that the SMOMS personnel policy requires all employees to report to management if they know of others who have suffered harassment.  Plaintiff's Additional SMF ¶ 55; Defendant's Reply SMF ¶ 55.  Lucas testified that she received no report from Dr. Traub about how Stevens was being treated.  *Id.* ¶ 58.

Stevens finally decided to report the harassment from Melcher and Pendleton to Lucas.  Plaintiff's Additional SMF ¶ 52; Stevens Decl. ¶ 49.  On April 30, 2019, Stevens sent Lucas a text stating: "If I hear one more person say my foot should be healed by now, I'm going to scream, that's not right."  Defendant's SMF ¶ 91; Plaintiff's Opposing SMF ¶ 91.  As of April 30, 2019, Stevens knew that SMOMS had a policy against harassment and understood that it was illegal to treat people differently because they have a disability and/or need special accommodations.  Plaintiff's Additional SMF ¶ 59; Stevens Decl. ¶ 63.[11]

---

[11] I deny SMOMS' request to strike Stevens' statement concerning her understanding of the law on the basis that it is inaccurate.  Defendant's Reply SMF ¶ 59.  To address the point, I have changed the wording of her statement to reflect that she "understood," rather than "knew," that certain conduct was illegal.

When Stevens met with Lucas in person on May 3, 2019, she recalls saying, "I want to be transferred to the Windham office because Pepper is not being fair with me.  She is forcing me to do more work than I am able to."  Plaintiff's Additional SMF ¶ 60; Defendant's Reply SMF ¶ 60. Lucas responded, "We don't move people around like that."  *Id*. ¶ 61.  Stevens shook her head and said, "It's been done before.  All kinds of people go back and forth."  Plaintiff's Additional SMF ¶ 61; Stevens Decl. ¶ 52.  Stevens also asked Lucas, "Why do you think Pepper is being so mean to me?  I say hello to her every day.  She says hello to everyone but me.  She avoids eye contact." Plaintiff's Additional SMF ¶ 62; Stevens Decl. ¶ 53.  Lucas responded, "I think you're just being too sensitive."  *Id*.  Stevens again told Lucas, "I don't need to hear people like Heather saying that I should be healed by now, because I've been out for four months now.  That's unacceptable." Plaintiff's Additional SMF ¶ 63; Stevens Decl. ¶ 54.  Lucas said, "I think you're being too sensitive."  *Id*.  The conversation ended when Lucas said, "I'm going to talk to the doctors to see if they've noticed anything."  Plaintiff's Additional SMF ¶ 64; Defendant's Reply SMF ¶ 64.

Lucas never talked to Pendleton about Stevens' complaint that she (Pendleton) was having Stevens do too much or that Stevens had any complaints about her.  Plaintiff's Additional SMF ¶ 65; Deposition of F. Pepper Pendleton ("Pendleton Dep."), Exh J. (ECF No. 40-10) to Stipulated Record, Page ID ## 1000-01 at 76, 78.  Pendleton has no recollection of any conversation with Lucas about Stevens feeling that she was being treated differently because of her foot.  Plaintiff's Additional SMF ¶ 66; Defendant's Reply SMF ¶ 66.  During the May 3, 2019, meeting, Lucas never said anything to Stevens about "investigating" or even talking to other people.  Plaintiff's Additional SMF ¶ 67; Stevens Decl. ¶ 57.  Rather, Lucas told Stevens that she was "going" to talk to the doctors.  *Id*.  Lucas' "investigation" of Stevens' complaints included a "pretty short, quick conversation" with Dr. Crawford, a quick "how is it going" in between surgeries with Dr. Mitchell

and "likely the same" thing with Dr. Doss, and a "how's it going" conversation with Dawn Bryant. Plaintiff's SMF ¶ 68; Lucas Dep., Page ID ## 424-26 at 131, 135-37. Lucas did not address any of Stevens' specific allegations with either Dr. Doss, Dr. Mitchell, Dr. Crawford, or Bryant. Plaintiff's Additional SMF ¶ 69; Defendant's Reply SMF ¶ 69.

Lucas understood that Stevens was dissatisfied with her response to the complaint. Defendant's SMF ¶ 99; Plaintiff's Opposing SMF ¶ 99. On Thursday, May 8, 2019, Stevens delivered written notice (dated May 6) of her resignation effective Thursday, May 16. *Id.* ¶ 100. When Stevens resigned, Lucas yelled at her, "After we held your job for you, this is how you repay us?" Plaintiff's Additional SMF ¶ 74; Stevens Decl. ¶ 59.

Stevens was fired six workdays after she met with Lucas. Plaintiff's Additional SMF ¶ 77; Defendant's Reply SMF ¶ 77. On May 13, 2019, Lucas phoned Stevens and said, "It's not working out. Just leave." Plaintiff's Additional SMF ¶ 76; Stevens Decl. ¶ 60. Stevens has no idea why she was fired. *Id.* SMOMS indicated at an earlier stage in this litigation that Stevens was fired after Pendleton informed Lucas that Stevens was "bullying other employees and that her behavior was unprofessional and insubordinate." Plaintiff's Additional SMF ¶ 80; Defendant's Reply SMF ¶ 80. Lucas now says she fired Stevens because, in her judgment, Stevens' dissatisfaction with Lucas' failure to take action against Pendleton and Melcher had caused her to become disruptive in the workplace. Defendant's SMF ¶ 101; Declaration of Kathleen Lucas ("Lucas Decl."), Exh. A (ECF No. 42-1) to Defendant's SMF, ¶ 16. Stevens was not behaving in a loud or disruptive manner the day she was fired. Plaintiff's Additional SMF ¶ 79; Stevens Decl. ¶ 61.

Pendleton has no recollection of any of Stevens' behaviors that may have formed the basis of her report to Lucas and "doesn't know the real reason why" Stevens was fired. Plaintiff's Additional SMF ¶ 81; Defendant's Reply SMF ¶ 81. Lucas did not personally observe Stevens

being loud or disruptive before she fired her, *id*. ¶ 83, and neither Dr. Crawford, Dr. Mitchell, nor Dr. Doss observed Stevens on the day she was fired, *id*. ¶ 84.  Dr. Traub did not recall observing anything of note on May 13, 2019, that had to do with Stevens behaving inappropriately or in an unprofessional manner and testified that he does not know why she was let go.  *Id*. ¶ 85.

### III.  Discussion

### A.  Failure-to-Accommodate Claims

SMOMS first seeks summary judgment as to the plaintiff's claims of failure to accommodate her disability on three bases: that (i) there is no triable issue as to whether SMOMS reasonably accommodated Stevens' disability, (ii) in any event, Stevens never informed SMOMS' owners or management that her disability was not being reasonably accommodated, and, in any event, (iii) Stevens cannot make the required showing that any failure to accommodate her disability affected the terms, conditions, or privileges of her employment.  *See* Motion at 2-15.[12] I am unpersuaded.[13]

With respect to the first point, SMOMS argues that, as in *Murray v. Warren Pumps, LLC*, 821 F.3d 77 (1st Cir. 2016), Stevens agreed that she would "self-monitor whether certain tasks were stressing h[er] physical abilities, and . . . make appropriate adjustments [her]self or request accommodation."  *Id*. at 6 (quoting *Murray*, 821 F.3d at 85).  Yet, in *Murray*, "Warren Pumps and Murray together established the boundaries of a reasonable accommodation" when "Murray

---

[12] Because "interpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand, courts generally address claims of failure to accommodate under the MHRA using an [ADA] framework."  *Kerry v. Sun Life Fin. (US) Servs. Inc.*, 2:17-CV-376-LEW, 2019 WL 206093, at *9 (D. Me. Jan. 15, 2019) (citations and internal quotation marks omitted).  I do the same here.

[13] In an abundance of caution, SMOMS also seeks summary judgment with respect to any claim by Stevens that SMOMS failed to reasonably accommodate her disability by insisting that she obtain a more specific doctor's note or by refusing to make available a position that would have allowed Stevens to sit all day.  *See* Motion at 5-6 & n.2.  I do not read the Second Amended Complaint to press such claims, *see* Second Amended Complaint ¶¶ 54, 62, nor does Stevens press them in her response, *see* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 48) at 12-16.

agreed to self-monitor[.]" *Murray*, 821 F.3d at 85. Although Murray insisted that his supervisor "already 'knew' of his restrictions," he made "no effort to account for the self-directed and discretionary nature of his mutually agreed accommodation." *Id*. Moreover, "when [Murray] did specifically inform [his supervisor] of his need to make adjustments or decline to do a task, [his supervisor] did not push him to perform the job personally." *Id*. at 86.

By contrast, it is not clear from the record that Stevens and SMOMS reached an agreement that she would self-monitor. Even if it were, Stevens adduces evidence that, unlike in *Murray*, when she informed her supervisor, Pendleton, that she needed a break in accordance with that doctor's note, Pendleton pushed her to continue performing her job, and Pendleton thereafter frequently asked her to work longer hours than her restrictions allowed.

With respect to the second point, SMOMS contends that Stevens' claim of disability discrimination founders because she admits that she never told either the owner-doctors or Lucas that she was violating her medical restrictions, unavailingly justifying her silence on the basis that the doctors "all knew" about her restrictions and should have been aware she was violating them. Motion at 7. SMOMS asserts that, while Stevens maintains that she complained to Pendleton, any such complaints were immaterial because Pendleton lacked the "authority to hire, fire, demote, promote, transfer, or discipline" and, hence, was not a "supervisor for Title VII purposes." *Id*. at 8-9 (quoting *Flanders v. Athenahealth, Inc*., No. 1:19-cv-00283-GZS, 2020 WL 6119512, at *10 (D. Me. Oct. 16, 2020) (rec. dec., *aff'd* Nov. 16, 2020)). At oral argument, SMOMS' counsel added that SMOMS' policy manual, ECF No. 40-5 at Page ID # 453, made clear that Lucas, the business manager, was the person to whom any need for a disability accommodation should have been reported.

14

However, Stevens raises a triable issue as to whether SMOMS was put on notice that her disability was not being accommodated. First, SMOMS' policy manual is not dispositive in SMOMS' favor. The cited page of the policy manual merely states that "[a]ny employee who believes s/he has been unreasonably denied a requested accommodation may bring that concern to the Practice[,]" ECF No. 40-5 at Page ID # 453; yet, insofar as appears, the word "Practice" is never defined in the manual and appears to be used generically to refer to SMOMS.

Second, even if the policy manual had directed that such reports be made to Lucas, Stevens presents evidence from which a trier of fact reasonably could conclude that:

1.    Pendleton was a supervisor for Title VII purposes; namely, that Pendleton was authorized to discipline employees in Lucas' absence and that Lucas was almost never in the Portland office (where Stevens worked).

2.    In any event, Dr. Crawford, one of the owner-doctors, was put on notice by virtue of his presence in the procedure room when Stevens alerted Pendleton that she needed a break, and Pendleton pressed her to continue assisting with Dr. Crawford's procedure.[14]

3.    In any event, Dr. Mitchell, another owner-doctor, himself mocked Stevens' disability, thereby necessarily putting SMOMS on notice of his own asserted misbehavior.

Turning to the third and final point, SMOMS asserts that (i) "[t]he Circuit Courts of Appeals have split on the question of whether a plaintiff who sues for a failure to accommodate must, like any other ADA plaintiff, establish that she suffered an adverse employment action[,]" (ii) "[t]he First Circuit has never squarely addressed the question[,]" sometimes including and sometimes omitting that prong in circumstances in which nothing has turned on its omission or

---

[14] Stevens testified that "during this procedure" she complained to Pendleton that she had been standing for too long. Defendant's SMF ¶ 74; Plaintiff's Opposing SMF ¶ 74. A fair inference is that Dr. Crawford was in the room at that time.

inclusion, and (iii) the better view, supported by the text and purpose of both the ADA and the MHRA, is that such a showing is required.  Motion at 9-12.  SMOMS contends that Stevens has not generated a triable issue that she suffered an adverse employment action, requiring dismissal of her failure-to-accommodate claims.  *See id*. at 13-15.

This court, however, recently rejected a defendant's argument that a plaintiff's claim of failure to reasonably accommodate his disability was "futile as a matter of law" because the plaintiff had conceded that he had not experienced an adverse employment action, citing 2018 and 2019 First Circuit caselaw in holding that the First Circuit does not require a showing of an adverse employment action to prevail on such a claim.  *Tucker v. Town of Scarborough*, Docket no. 2:19-cv-00213-GZS, 2020 WL 3271936, at *8 (D. Me. June 17, 2020) (citing *Flaherty v. Entergy Nuclear Operations, Inc*., 946 F.3d 41, 55 (1st Cir. 2019); *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 553 (1st Cir. 2018)).  I follow suit.

SMOMS, hence, falls short of demonstrating its entitlement to summary judgment on Stevens' claims of failure to reasonably accommodate her disability.

## B.  Intentional Discrimination Claims

SMOMS next seeks summary judgment with respect to Stevens' claims of intentional disability discrimination on the basis that her evidence falls short as a matter of law of establishing that she was subjected to a hostile work environment at SMOMS.  *See* Motion at 15-18.[15]  I find otherwise.

---

[15] Stevens maintains that, in so arguing, SMOMS ignored a second theory of intentional discrimination pleaded in her Second Amended Complaint: that she was fired because she needed an accommodation for her disability.  *See* Opposition at 8.  She contended that pursuant to Local Rule 7(c), SMOMS was barred from raising for the first time in its reply brief any argument pertaining to that second theory.  *See id*. at 8 n.10.  SMOMS responded that it had framed its motion to address every theory fairly pleaded in the Second Amended Complaint, arguing that "[t]he Court should reject the Plaintiff's attempt to salvage her case by arguing that the theory she now espouses, although not explicitly asserted, was somehow implied in her Second Amended Complaint[.]"  Defendant's Reply Memorandum in Support of Motion for Summary Judgment ("Reply") (ECF No. 57) at 3-4.  I need only rule on whether SMOMS

The First Circuit has recognized that a plaintiff may maintain a claim for disability harassment under a hostile work environment theory.  *See, e.g., Murray*, 821 F.3d at 86.  "To succeed, a hostile work environment claim requires, in addition to proof of other elements, evidence that the discriminatory conduct was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment."  *Id*. (citations and internal quotation marks omitted).[16]

"Under First Circuit law, determining whether harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment depends on all the relevant circumstances."  *Richardson v. Mabus*, 203 F. Supp. 3d 86, 160 (D. Me. 2016) (citations and internal punctuation omitted).  "Relevant factors include the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance."  *Id*. (citation and internal quotation marks omitted).

"The challenged conduct must be both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so."  *Brader v. Biogen Inc.*, 983 F.3d 39, 59 (1st Cir. 2020) (citation and internal quotation marks omitted).  "The law is without a mathematically precise test to determine whether a plaintiff presents sufficient evidence of a severely and pervasively hostile work environment, but the thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  *Richardson*, 203 F. Supp. 3d at 160 (citations and internal punctuation omitted).

---

is entitled to summary judgment on the bases presented.  I need not and do not address the merits of this collateral dispute.

[16] The MHRA also requires, *inter alia*, a showing "that the harassment was sufficiently severe or pervasive so as to alter the conditions of [a] plaintiff's employment and create an abusive work environment[.]"  *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897, 902 (citation and internal quotation marks omitted).

"Subject to some policing at the outer bounds, it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Rivera-Rivera v. Medina & Medina, Inc*., 898 F.3d 77, 91 (1st Cir. 2018) (citation and internal quotation marks omitted).

SMOMS contends that Stevens makes an insufficient showing to cross this threshold, asserting that the conduct (i) was episodic in nature, with Melcher allegedly making a total of three disparaging comments, only one directly to Stevens' face, (ii) may have been subjectively upsetting but was hardly severe, Stevens not having claimed that either Pendleton or Melcher raised their voices or used profanity, and (iii) was not physically threatening. *See* Motion at 17-18.

Stevens rejoins that a reasonable jury could find that the totality of the incidents of which she complains within just the six days before she felt compelled to write a letter to Human Resources was sufficiently severe or pervasive to constitute a hostile work environment, and that a reasonable employee in her shoes would have found it to be so. *See* Opposition at 10-11. I agree.

As a threshold matter, Stevens need not prove that the conduct at issue was severe or physically threatening to make the required showing. The First Circuit has clarified:

> While it is true that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment, we have also made clear that frequent incidents of harassment, though not severe, can reach the level of pervasive, thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists.

*Rivera-Rivera*, 898 F.2d at 93 (citations and internal punctuation omitted).

Viewing the facts in the light most favorable to Stevens, a reasonable jury could find that after Stevens worked for nearly seven years as a dental assistant for SMOMS without significant incident, the tone and temperature of her workplace altered sufficiently to create a hostile work

environment commencing shortly before her medical leave of absence and continuing through the date she was fired, and that the timing was no coincidence.

On December 20, 2018, after Stevens had notified Lucas of her planned surgery at the end of that month, Stevens emailed Lucas to request a transfer because of the challenges she was having in getting along with Pendleton, culminating in an incident that day in which Pendleton yelled at her after the two accidentally collided at work. Stevens attributed Pendleton's outburst not to the collision but, rather, to her upcoming medical leave of absence.

When Stevens called Lucas on March 21, 2019, to advise her that, per her doctor's orders, she needed to extend her leave, Lucas responded angrily, stating, "I can't believe you're going to be out a whole other month," and asking, "Why aren't you able to come back?," leaving Stevens in tears and causing her to fear for her job. Then, within a six-day span following Stevens' return to work on April 19, 2019, Dr. Mitchell, a SMOMS owner-doctor, mocked her disability by limping and did it again after she told him to stop; Pendleton, Stevens' supervisor, who was aware of her disability accommodations, denied her request for a break during a procedure, following which Stevens felt pressure to remain standing even when she needed a break; Pendleton continued to request that Stevens work longer hours than the limits set by her doctor, rolling her eyes and commenting in exasperation, "How much longer are we going to have to do this?"; and Stevens' co-worker Melcher remarked on several occasions that Stevens should not need a special accommodation, should be healed by now, or should not need special treatment.

When Stevens met with Lucas on May 3, 2019, after complaining to her on April 30, 2019, that she was "going to scream" if she "heard one more person say my foot should be healed by now," Lucas told her she was "being too sensitive." Stevens delivered her written notice of resignation (dated May 6 and effective May 16) on May 9, prompting Lucas to yell at her, "After

we held your job for you, this is how you repay us?"  Lucas then fired Stevens four days later, on

May 13, for reasons that were not apparent to Stevens or others at SMOMS.

The picture Stevens paints is not one of "the ordinary, if occasionally unpleasant,

vicissitudes of the workplace[.]"  *Brader*, 983 F.3d at 60 (citation and internal quotation marks

omitted).  Stevens subjectively found the conduct she describes hostile or abusive and offensive,

and a trier of fact crediting her version of events could find that a reasonable person in her shoes

would have found it to be so, as well.  *See, e.g., DePaolo v. GHM Portland MAR, LLC*, No. 2:16-

cv-00468-NT, 2018 WL 3822455, at *14 (D. Me. Aug. 10, 2018) (rec. dec., *aff'd* Sept. 28, 2018)

(plaintiff made out a triable issue on his claim that he was subjected to a disability-based hostile

work environment when jury could conclude that "there was a marked change in [his supervisor's]

treatment of [him] beginning at about the time of [his] chemotherapy, at which point [the

supervisor] became highly critical of him and hostile toward him, began frequently yelling and

screaming at him, and referred to him on multiple occasions as a 'chemo brain'") (citations

omitted).[17]

### C.  Retaliation Claims

SMOMS finally seeks summary judgment as to (i) Stevens' claims of retaliation pursuant

to the ADA and the MHRA on the basis that she fails to show that she engaged in legally-protected

conduct and (ii) Stevens' retaliation claims alleging retaliation in the form of harassment on the

---

[17] *Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17 (1st Cir. 2011), which SMOMS cites for the proposition that the behavior Stevens describes "does not begin to approach 'the level of severity or pervasiveness that a reasonable employee would find to have materially altered the conditions of her employment such that an abusive work environment was created[,]'" Motion at 17 (quoting *Colón-Fontánez*, 660 F.3d at 45), is distinguishable.  In *Colón-Fontánez*, the conduct at issue occurred over a much longer period, from 2005 to 2008, the court found that, "although [the plaintiff's supervisor's] interactions with [the plaintiff] may be described as brusque and even uncivil, . . . a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws[,]" and the plaintiff herself had "repeatedly" asserted that the conduct at issue had not affected her overall work performance.  *Colón-Fontánez*, 660 F.3d at 34, 44-45.

basis that she falls short of demonstrating that any alleged harassment was "materially adverse[.]" Motion at 18-25.  Again, I am unpersuaded.

To make out a retaliation claim pursuant to the ADA or the MHRA, a plaintiff must "establish (1) that [s]he was engaged in protected activity, i.e., availed h[er]self of rights under the relevant statutes; (2) that [s]he suffered a materially adverse action or was adversely affected; and (3) that there was a causal connection between the protected activity and the adverse action." *Morin v. Hannaford Bros. Co., LLC*, Docket no. 1:17-CV-50-GZS, 2018 WL 2746570, at *14 (D. Me. June 7, 2018).

"A retaliation claim under the ADA does not automatically fail with the underlying disability claim[;] [a] plaintiff may assert such a [retaliation] claim even if the underlying claim of disability fails." *Johnson v. Spencer Press of Me., Inc*., 249 F. Supp. 2d 5, 6 (D. Me. 2003) (citation and internal quotation marks omitted).  "It is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that [s]he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it."  *Id*. (citations and internal quotation marks omitted).

"To make out a prima facie case of retaliation" pursuant to the Maine Family Medical Leave Requirements law (MFMLR), a plaintiff "must show that (1) [s]he availed h[er]self of a protected right under the [MFMLR]; (2) [s]he was adversely affected by an employment decision;" and "(3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Paraskevopoulos v. Cent. Me. Med. Ctr.*, No. 2:17-cv-00166-JAW, 2019 WL 3767462, at *15 (D. Me. Aug. 9, 2019) (rec. dec., *aff'd* Sept. 25, 2019) (citation and internal quotation marks omitted).

To demonstrate an "adverse action" for purposes of any of the foregoing retaliation claims, a plaintiff must show that the employer engaged in conduct "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted).

SMOMS first contends that, for purposes of her ADA and MHRA retaliation claims, Stevens cannot show that she engaged in protected activity because "no reasonable person, charged with substantive knowledge of the law, would believe that Pepper Pendleton's eye-rolling, or three comments made by Heather Melcher (only one to Stevens' face), created a hostile work environment." Motion at 23 (citation and internal quotation marks omitted).

SMOMS also argues that, to the extent Stevens alleges retaliation in the form of harassment, "the pre-termination conduct Stevens characterizes as 'harassment' – Pendleton rolling her eyes, sighing, and generally expressing her impatience with Stevens' recovery, and Melcher's comments questioning the speed of her recovery – were not 'materially adverse' under the First Circuit's application of the *Burlington Northern* standard." *Id*. at 25.

SMOMS' bid for summary judgment on these bases hinges on too crabbed an interpretation of the plaintiff's claims. To demonstrate that she engaged in protected conduct pursuant to the ADA and the MHRA, Stevens must show only that she had "a reasonable, good-faith belief that a violation occurred[.]" *Johnson*, 249 F. Supp. 2d at 6 (citations and internal quotation marks omitted). Because, as discussed above, Stevens makes out a triable issue that she was subjected to a disability-based hostile work environment, she makes out a triable issue that she had such "a reasonable, good-faith belief[.]" *Id*. That she did not inform Lucas of the full panoply of conduct she believed constituted harassment is not fatal. She need only have "acted on" that reasonable,

good-faith belief, *id.* (citation and internal quotation marks omitted), which she did in complaining to Lucas about Pendleton's and Melcher's conduct and stating, "If I hear one more person say my foot should be healed by now, I'm going to scream, that's not right."  Defendant's SMF ¶ 91; Plaintiff's Opposing SMF ¶ 91.  *See, e.g., DePaolo*, 2018 WL 3822455, at *9-10 (plaintiff raised triable issue that he had engaged in protected conduct when he complained to Human Resources that his supervisor had referred to him on a number of occasions as a "chemo brain," and a "reasonable jury could find that this derogatory allusion to [the plaintiff's] known disability sufficed to place [Human Resources] on notice of a complaint of disability discrimination").

Finally, Stevens makes out a triable issue that SMOMS subjected her to conduct that qualifies as an adverse action pursuant to *Burlington Northern* not only by firing her but also by subjecting her to a hostile work environment.[18]

## IV.  Conclusion

For the foregoing reasons, SMOMS' motion for summary judgment is **DENIED**.


Dated this 6th day of March, 2022.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[18] For purposes of resolving the instant motion I need not reach, and therefore express no opinion on, the plaintiff's third theory of retaliation for taking protected disability leave: that, while another employee who had been injured but had taken no leave was permitted to work 40-hour weeks for a month doing paperwork, she was not.  *See* Opposition at 22.